UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

**Dale Duguay**

     v.

**US Social Security Administration,**
**Acting Commissioner, Nancy A. Berryhill**

Civil No. 15-cv-520-PB
Opinion No. 2017 DNH 064

**MEMORANDUM AND ORDER**

     Dale Duguay challenges the Social Security Administration's decision to deny his claim for disability insurance benefits ("DIB").  See 42 U.S.C. § 423.  He argues that the Administrative Law Judge ("ALJ") erred by failing to call a medical advisor to help determine the onset date of his disability.  The Acting Commissioner moves for an order affirming the ALJ's decision.  For the following reasons, I remand for further administrative proceedings.

## I.  BACKGROUND[1]

     Duguay is a fifty-four-year-old man who previously ran a family contracting business, but stopped working in 2012.  His date last insured for purposes of DIB was March 31, 2013.  In

---

[1] In accordance with Local Rule 9.1, the parties have submitted a joint statement of stipulated facts (Doc. No. 12).  Because that statement is part of the court's record, I recount the facts only as relevant to the disposition of this matter.  I focus on the medical record before December 14, 2013, the date that the ALJ fixed for the onset of Duguay's disability.

the 1980s, Duguay suffered stab wounds that required several corrective surgeries and resulted in abdominal complications, including recurrent bowel obstructions, hernias, and chronic pain.[2]  Tr. at 54-59.  He became a poor candidate for more surgeries due to accumulated adhesions and the risks associated with surgery.  Tr. at 59.  To cope with the pain, he was placed on opiate therapy.  To cope with the abdominal issues, he engaged in self-care that he learned from a physician.  That care included dietary changes, lying down, and techniques such as manually "manipulat[ing] the intestine back through the abnormality of the fascia or the abdominal wall."  Tr. at 56-60.  In addition to the abdominal issues, Duguay also suffered from diabetes mellitus, anxiety, and depression.

In 2011, Duguay's physical symptoms began to worsen.  Tr. at 48-57, 64, 303.  Treatment notes from the medical provider managing Duguay's chronic abdominal pain show that he had a large protruding abdomen with fist-sized hernias.  The January 2012 treatment notes are similar, with Duguay reporting two or three bowel obstructions a month, and two or three "bad ones a year in which he is in bed for 10 days."  Tr. at 261.

The next month, in February 2012, Duguay had an especially severe episode of bowel obstruction.  Seeking relief, he went a

---

[2] For ease of discussion, I will refer to these conditions collectively as the "abdominal issues."

2

hospital emergency department to use a nasogastric tube, which required the assistance of four nurses and a physician.  The physician noted that the "extreme difficulty" of passing the tube forced him to "reach into the back of [Duguay's] throat and redirect the tube down into the esophagus, as each time it would curl up."  Tr. at 491–92.  Several cups of blood were filled and other fluid was drained.  Tr. at 60, 492.  Treatment notes state that Duguay's "abdomen is essentially one large hernia" and observe that he was suffering "acute distress" from "[c]omplete mechanical small bowel obstruction, secondary to adhesions."  Tr. at 491.  Several diagnostic tests were taken and recorded, and he was hospitalized overnight.  Tr. at 493–99.  Although Duguay seemed better the next morning, the treating physician planned to keep him hospitalized for, among other reasons, pain control.  Tr. at 491–93.  Duguay, however, concluded that the worst of his bowel obstruction episode was over, the nasogastric tube was ineffective, and the hospital could do nothing to further improve his condition but was costing him thousands of dollars per day.  Tr. at 61.  He ultimately left against medical advice.  Tr. at 61, 493.

A few days later, Duguay began seeing primary care physician Brian Sponseller, M.D.  Dr. Sponseller's initial physical examination report noted several hernias, but stated that pain medication was effective.  Dr. Sponseller remarked

3

that the significant abdominal issues 'are what they are,' and
that he would have Duguay hospitalized if it became necessary.
Tr. at 62, 277-79.  For the next year and a half, Duguay visited
Dr. Sponseller periodically to treat his hyperlipidemia,
hypertension, and diabetes.  See Tr. at 279, 633.  Although Dr.
Sponseller's treatment notes from this period refer to Duguay's
significant abdominal hernias and his continuing reports of
chronic abdominal pain, most of the notes concern Duguay's
opioid prescriptions and diabetes treatment.  See, e.g. Tr. at
279, 281-82.

During this period, Duguay felt that his "medical needs
were just spiraling out of control."  Tr. at 64; see Tr. at 48,
50-52.  Finding himself increasingly confined to bed for
significant periods of time, Duguay stopped working and wound up
the family business in June 2012.  The symptoms continued
escalating, and photographs from early 2013 illustrate that the
hernias were "much larger than a fist":


[Redacted medical records]


Tr. at 97, 218-220.  The frequency of his partial bowel
obstructions was "becoming unbearable," Tr. at 55-57, 65, and he
experienced complete obstructions that he described as "laying
in bed with a Maxwell House can next to you that you're vomiting

4

into and having uncontrolled bowel activity and the most unbelievable pain that you can imagine," Tr. at 56.  Even with opiate therapy, Duguay described going "through a lot of hell." Tr. at 63.  Despite the worsening symptoms, he believed that self-care at home was his only option beyond his opiate prescription.  Tr. at 67.  He did not seek other professional medical treatment during this period because surgery was not a viable option, see Tr. at 58-59, 332, 343-45, 503, 762, palliative relief beyond painkillers was ineffective, Tr. at 63, 69, and he was constrained by limited financial resources, see Tr. at 50-52, 61-62, 298.

In the summer of 2013, state agency doctors issued medical opinions.[3]  In a consultative examination, state physician Peter Loeser, M.D., noted Duguay's reports that he suffered from severe abdominal pain and also recurrent small bowel obstructions three or four times per month, each lasting from a day to ten days.  The examination notes state that Duguay's abdomen had "mild diffuse tenderness without rebound tenderness"

---

[3] A number of opinions addressing psychological issues were also issued.  Dr. Sponseller stated in response to a questionnaire that Duguay's mental status and functioning were normal.  In a state consultative examination, psychologist Cheryl Bildner, Ph.D., diagnosed depressive and anxiety disorders, and found that Duguay had significant limitations in areas such as concentration.  Tr. at 294-98.  In a state psychiatric review, psychologist Stacey Fiore, Psy.D., opined that Duguay had moderate difficulties in daily activities, social functioning, and concentration.  Tr. at 99.

and "marked abdominal wall protrusions and irregularity."  Tr. at 303-05.  Dr. Loeser opined that the abdominal issues "would not likely improve with further surgical interventions," and he "would expect [Duguay's] symptoms to have at least a mild to moderate effect on his overall functional capacity."  Tr. at 305.  Although Dr. Loeser physically examined Duguay, he did not treat him or assess specific residual functional capacities.

State physician Jonathan Jaffe, M.D., also issued an opinion.  He did not treat or examine Duguay, and his opinion was based on a review of the medical record, including Dr. Loeser's physical examination.  But he reviewed an incomplete medical record that was missing treatment notes.  Tr. at 26.  He also made incorrect factual statements, including that "there were '[n]o visits/hospitalizations for [small bowel obstructions],'" which conflicts with medical records reflecting Duguay's February 2012 hospitalization.  Dr. Jaffe opined that his review of the record "does not support more than moderate impairment."  Tr. at 102.

In December 2013, Duguay was again hospitalized for abdominal issues.  The hospitalization was precipitated when, after a long drive in which the steering wheel rubbed against his abdomen, a fluid blister popped and drained fluid.  Tr. at 331-32, 635.  He initially attempted self-care at home, but when the wound became "green with an extremely foul odor" and

6

"expel[led] brown fluid," he "decided to come in and have it looked at" by Dr. Sponseller.  Tr. 338, 635.  An operation was planned, but when the surgeon recommended a "complete abdominal revision," Duguay self-transferred to a different hospital.  Tr. at 332, 338, 635.  Treatment notes recount that Duguay arrived "on [a] high dose of narcotics for chronic pain related to [the] previous abdominal" issues, which have a "very complicated history."  Tr. at 332, 762.  Duguay was hospitalized for a week, and a variety of diagnostic tests were taken and recorded. E.g., Tr. at 354.  Treating physician Frederick Radke, M.D., diagnosed Duguay with an enterocutaneous fistula.  See Tr. at 332.  Most enterocutaneous fistulas develop following abdominal surgery or conditions such as bowel obstruction.[4]  Following the December 2013 hospitalization, Duguay's condition continued to worsen, and in 2014 he underwent two hernia surgeries and was diagnosed with acute renal failure, diabetic ketoacidosis, and hyperkalemia.  See Tr. at 27, 501–507, 637, 644, 646, 702, 763, 778.

---

[4] "Enterocutaneous fistulas (ECFs) are abnormal connections between the gastrointestinal tract and the skin.  The majority (~85%) of ECFs develop following abdominal surgery for intestinal malignancy, inflammatory bowel disease (IBD), recurrent explorations, or after extensive adhesiolysis for conditions such as small bowel obstruction."  Guy R. Orangio, M.D., Enterocutaneous Fistula: Medical and Surgical Management Including Patients with Crohn's Disease, Clinics in Colon and Rectal Surgery, 2010 Sep; 23(3), 169–175, available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2967316.

Medical opinions from early 2014 reflect Duguay's worsening condition.  In March 2014, treating primary care physician Dr. Sponseller opined in a physical impairment questionnaire that Duguay had severe, disabling limitations.  Tr. at 441–44.  He opined that Duguay expressed constant attention difficulties, could not perform even low-stress jobs, would need unscheduled breaks during the day, could never lift 10 pounds, would miss about four days of work per month, and could not stand, sit, or walk for the full eight-hour workday.  Tr. at 441–44.  The opinion was retroactive, with Dr. Sponseller opining that Duguay's impairments and limitations "existed since the . . . alleged onset date of [June] 2012."  Tr. at 440–441, 24.  The next month, Dr. Sponseller opined that Duguay should be excused from any absences because he was immobile.  Tr. at 792.  That same month, State physician Dr. Peter Bradley opined in a Medicaid disability determination that Duguay was restricted to less than sedentary work, Tr. at 647–53, and Duguay returned to the hospital twice for abdominal pain and complications from his fistula.  See Tr. at 27, 461–79.  Later in 2014, Dr. Radke, a treating surgeon, opined in a physical impairment questionnaire that Duguay had several severe limitations and an inability to perform any work generally requiring an upright position, which "seems to exacerbate his recurrent small bowel obstructions and subsequent fistulas."  Tr. at 758–59.

8

Duguay filed for SSI and DIB in March 2013 alleging a
disability onset date of June 2012.  Tr. at 17, 194-95.  His
initial application for benefits was subsequently denied in
August 2013, and he requested a hearing before an ALJ.  In
September 2014, an ALJ finally held a hearing on Duguay's
disability benefits claim.  Tr. at 35.  Soon thereafter, the ALJ
issued an opinion determining that Duguay first became disabled
on December 14, 2013, when he was hospitalized for the fistula.
Tr. at 17-29.  This onset date determination meant that Duguay
was eligible for SSI benefits, but ineligible for any DIB
benefits because his "date last insured" ("DLI")[5] for DIB
purposes was nine months before the onset date found by the ALJ.
The Appeals Council declined to review the ALJ's decision, and
the present action followed in this court.

## II.   STANDARD OF REVIEW

I am authorized to review the pleadings submitted by the
parties and the administrative record and enter a judgment
affirming, modifying, or reversing the "final decision" of the
Commissioner.  See 42 U.S.C. §§ 405(g); 1383(c)(3).  That review
is limited, however, "to determining whether the ALJ used the
proper legal standards and found facts [based] upon the proper

---

[5] See 20 C.F.R. §§ 404.130, 404.131(a), 404.132; Doc. No. 8-1 at
4 n.1.

quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).  I defer to the ALJ's findings of fact, so long as those findings are supported by substantial evidence.  Id.  Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).

If the substantial evidence standard is met, the ALJ's factual findings are conclusive, even where the record "arguably could support a different conclusion." Id. at 770.  Findings are not conclusive, however, if the ALJ derived his findings by "ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).  The ALJ is responsible for determining issues of credibility and for drawing inferences from evidence in the record.  Irlanda Ortiz, 955 F.2d at 769.  It is the role of the ALJ, not the court, to resolve conflicts in the evidence. Id.

### III.  ANALYSIS

On appeal, Duguay challenges the ALJ's determination that he did not become disabled until December 14, 2013, which

10

postdated his DLI and rendered him ineligible for DIB.  Duguay
argues that the ALJ violated SSR 83-20 by inferring the onset
date of his disability based on a sparse medical record, without
consulting a medical advisor.  In response, the Acting
Commissioner argues that the ALJ did not violate SSR 83-20
because "precise medical evidence" "unambiguously supports" the
December 14, 2013 onset date, thereby freeing the ALJ from the
need to consult a medical advisor before determining the onset
of Duguay's disability.  See Doc. No. 14-1 at 5-6, 10-11.

**A.   SSR 83-20**

"[T]he onset date is critical" in cases like this one
because it is "determinative of whether [Duguay] is entitled to
or eligible for any [DIB] benefits."  See SSR 83-20, 1983 WL
31249, at *1 (Jan. 1, 1983) ("SSR 83-20").  The purpose of SSR
83-20 is to "describe the relevant evidence to be considered
when establishing the onset date of disability."  Id.  SSR 83-20
is binding, Blea v. Barnhart, 466 F.3d 903, 909 (10th Cir.
2006), and it requires ALJs to consider "factors that include
'the individual's allegation, the work history, and the medical
evidence.'"  Fischer v. Colvin, 831 F.3d 31, 35 (1st Cir. 2016)
(quoting SSR 83-20 at *1).  "The starting point . . . is the
individual's statement as to when disability began," which
"should be used if it is consistent with all the evidence
available."  SSR 83-20 at *2-3.  The date that the individual

stopped working is also "frequently of great significance in selecting the proper onset date." See id. at *2. "These two factors are significant, however, only to the extent that they are 'consistent with the severity of the condition(s) shown by the medical evidence,' which 'serves as the primary element in the onset determination.'" Wilson v. Colvin, 17 F. Supp. 3d 128, 138 (D.N.H. 2014) (quoting SSR 83-20 at *1-2).

"[SSR 83-20] recognizes that [the onset date] determination may be especially difficult when 'the alleged onset and the date last worked are far in the past and adequate medical records are not available.'" Fischer, 831 F.3d at 35 (quoting SSR 83-20 at *2). "In such cases, if the alleged disability involved a slowly progressing impairment, the ALJ may need 'to infer the onset date' based on 'medical and other evidence that describe the history and symptomatology of the disease process.'" Id. (quoting SSR 83-20 at *2). "Where an inference must be made, it 'must have a legitimate medical basis.'" Id. (quoting SSR 83-20 at *3). "To this end, SSR 83-20 requires that '[a]t the hearing, the [ALJ] should call on the services of a medical advisor when onset must be inferred.'" Id. (alterations in original) (quoting SSR 83-20 at *3).[6] Conversely, an ALJ need

---

[6] The Acting Commissioner does not dispute that SSR 83-20's medical advisor provision is mandatory. See SSR 83-20 at *3 ("[T]he [ALJ] should call on the services of a medical advisor when onset must be inferred."); Fischer, 831 F.3d at 39

not call a medical advisor where no inference is required because "precise medical evidence" unambiguously establishes the onset date.  See id. at 35-36.

## B.  **Application**

The question presented here is not whether Duguay is disabled, which is a matter that is not in dispute.  Rather, the issue is whether the ALJ violated SSR 83-20 when determining the onset date of Duguay's disability.  See Blea, 466 F.3d at 908. Duguay argues that "[t]he ALJ was obligated to call a medical advisor to the hearing under SSR 83-20 because the onset date of disabling symptoms is ambiguous due to a gap in medical treatment and evidence."  Doc. No. 8-1 at 4.  The Acting Commissioner responds by claiming that the ALJ did not need to infer the onset date here because "the record," including "precise medical evidence," "unambiguously supports" the disability onset date fixed by the ALJ.  See Doc. No. 14-1 at 5–

---

("[C]ounsel for the Commissioner conceded that 'should' is mandatory."); Wilson, 17 F. Supp. 3d at 141 ("The First Circuit's decision in May makes clear that an ALJ is required to employ the services of a medical advisor when the available evidence regarding disability onset is ambiguous.") (citing May v. Soc. Sec. Admin. Comm'r, 125 F.3d 841 (1st Cir. 1997) (per curiam) (unpublished) (collecting cases)); Warneka v. Colvin, 2015 DNH 071, 8 (noting that "courts agree" and collecting cases).  But see Eichstadt v. Astrue, 534 F.3d 663, 667 (7th Cir. 2008) (construing SSR 83-20 as non-mandatory).

6, 10–11.[7]  For the following reasons, I conclude that the ALJ
erred by failing to consult a medical advisor before determining
the onset date of Duguay's disability.[8]

As a preliminary matter, I note that the record contains
considerable evidence supporting an earlier onset date than the
December 14, 2013, date fixed by the ALJ.  As the ALJ
acknowledges, treating primary care physician Dr. Sponseller
opined in 2014 that Duguay "has been significantly limited since
June 2012."  Tr. at 24.[9]  Dr. Sponseller's opinion was based on
his lengthy treatment relationship with Duguay that began
immediately after Duguay's 2012 hospitalization and continued
through the December 2013 episode and into 2014.  See Tr. at

---

[7] Neither party argues that Duguay has a disability of "traumatic
origin," which SSR 83-20 analyzes under a separate framework.

[8] The Acting Commissioner also challenged Duguay's argument by
claiming that, under SSR 83-20, "inferences as to onset are only
needed when an impairment potentially becomes disabling prior to
the first recorded medical examination."  See Doc. No. 14-1 at
6.  I decline to address this argument because the Acting
Commissioner failed to develop it in his brief.

[9] The Acting Commissioner argues that the ALJ construed Dr.
Sponseller's 2014 medical opinion as "prospective," "not
retrospective."  Doc. No. 14-1 at 9 & n.4.  But that position is
hard to square with the opinion itself, see Tr. at 440-41, and
with the ALJ's own characterization of the opinion.  Compare Tr.
at 24 (stating that Dr. Sponseller "opined [that Duguay] has
been significantly limited since June 2012"), with Pierce v.
Astrue, No. 1:10-cv-242-JAW, 2011 WL 2678919, at *5 (D. Me. July
7, 2011) ("[The ALJ] supportably determined that [the medical]
opinion" was prospective, not retrospective.), report and
recommendation adopted, No. 1:10-CV-00242-JAW, 2011 WL 3270251
(D. Me. July 29, 2011).

440–44.  The ALJ was required to give "'controlling weight' to
[this] opinion [if it] 'is well-supported by medically
acceptable clinical and laboratory diagnostic techniques and is
not inconsistent with the other substantial evidence in [the]
case record.'"  Widlund v. Astrue, No. 11-cv-371-JL, 2012 WL
1676990, at *8 (D.N.H. Apr. 16, 2012) (last alteration in
original) (quoting 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)),
report and recommendation adopted sub nom., Widlund v. U.S. Soc.
Sec. Admin., Comm'r, No. 11-cv-371-JL, 2012 WL 1676984 (D.N.H.
May 14, 2012).  Instead, without substantial justification, the
ALJ gave this opinion "little weight."  Tr. at 24.  The June
2012 onset date identified by Dr. Sponseller also coincides with
the date Duguay stopped working, which is "frequently of great
significance in selecting the proper onset date."  See SSR 83-20
at *2.  June 2012 is likewise the onset date alleged by Duguay
himself, and is thus the "starting point," which "should be used
if it is consistent with all the evidence available."  See id.
at *2–3.

    Despite this evidence supporting an earlier onset date,
"[t]he ALJ did not reference SSR 83-20 in [his] decision."  See
Wilson, 17 F. Supp. 3d at 139; Blea, 466 F.3d at 905.  It thus
fell to the Acting Commissioner to develop an after-the-fact
explanation in this court as to why the ALJ did not feel the
need to consult a medical advisor before inferring the onset

date of Duguay's disability.  Assuming that mantle, the Acting
Commissioner cites three pieces of evidence in support of his
argument that the ALJ did not need to infer an onset date
because precise medical evidence unambiguously supports the
ALJ's determination that Duguay was not disabled until December
2013.

1.   Dr. Sponseller's Contemporaneous Treatment Notes

The Acting Commissioner first cites the treatment notes of
primary care physician Dr. Sponseller.  The Acting Commissioner
argues that these notes provide precise medical evidence that
Duguay was not disabled before December 2013 because they do not
reflect reports of small bowel obstruction or treatment for the
abdominal issues between Duguay's hospitalizations in February
2012 and December 2013.  I disagree.

The principal flaw in the Acting Commissioner's argument is
that the Acting Commissioner attempts to characterize the
absence of evidence of treatment as precise medical evidence
that Duguay was not disabled.  In pressing this argument, the
Acting Commissioner runs headlong into the problems at issue in
Blea, where an "ALJ improperly made inferences based on a 'gap
in the [claimant's] medical record.'" Fischer, 831 F.3d at 36
(quoting Blea, 466 F.3d at 912–13  Here, although Duguay and his
wife testified at the hearing to continuing debilitating
conditions in 2012 and 2013, the ALJ based his onset date

determination in part on the fact that the medical record is
sparse during this period.  <u>See</u> Tr. 83.  In analyzing Dr.
Sponseller's treatment notes from the period between Duguay's
hospitalizations, the ALJ wrote the following:

> [T]he claimant <u>did not seek</u> regular treatment for [his
> obstructive bowel] condition, <u>nor</u> have any emergency
> treatment for exacerbations.  The claimant was
> regularly treating with Dr. Sponseller, where he
> complained of abdominal pain and received a
> prescription for Oxycodone, but these treatment
> note[s] <u>do not reflect</u> any reports of recent
> obstruction or complaints of being restricted to his
> bed for pain management.  The claimant testified that
> his lack of insurance prevented him from receiving
> care for this condition, but he was able to receive
> treatment for his diabetes mellitus with Dr.
> Sponseller and <u>did not, at those visits, complain</u> of
> anything beyond abdominal pain. . . . [T]reatment
> notes from Dr. Sponseller <u>do not regularly describe</u>
> the claimant as presenting in pain or with any
> abnormalities related to his abdomen. . . . He
> previously had been able to work with use of an
> abdominal binder and long-acting oxycodone therapy,
> but treatment notes <u>do not reflect</u> any significant
> change in his condition on or around the alleged onset
> date [that] rendered these therapies ineffective. . .
> . Treatment notes <u>do not reflect</u> reports of any small
> bowel obstruction or other acute condition.

Tr. at 23 (emphasis added).  Putting aside any inaccuracies in
the ALJ's account, these treatment notes still do not offer
medical evidence unambiguously establishing a disability onset
date.  <u>See</u> <u>Blea</u>, 466 F.3d at 912-13.

The Acting Commissioner is correct that "[a] lack of
evidence of treatment is relevant to the severity of a
claimant's impairments and can support an inference that the

17

claimant was not disabled."  See Doc. No. 14-1 at 11 (quoting
Tardiff v. Astrue, No. 11-cv-17-JD, 2012 WL 777484, at *10
(D.N.H. Mar. 7, 2012)).  Nevertheless, an inference is still
required in such circumstances, and the absence of treatment for
a specific condition will rarely, if ever, qualify as precise
medical evidence that a serious medical condition had not yet
become disabling.  It is also true that, "[a]rguably, every
onset determination reached by an ALJ — a lay individual with no
required medical training — will involve some degree of
ambiguity and inference."  Fischer, 831 F.3d at 35.  But
evidence that is merely "relevant" and "support[ive]" of the
ALJ's onset date determination is a far cry from "precise
medical evidence."  Compare Fischer, 831 F.3d at 36 and Doc. No.
14-1 at 5-6 with id. at 11.

     In this way, the Acting Commissioner's heavy reliance on
the First Circuit's recent decision in Fischer is also
inapposite.  See id. at 36.  There, "[t]he ALJ did not rely upon
the absence of medical evidence but rather the existence of
'precise' medical evidence — the normal results of the
diagnostic imaging — when concluding that [the claimant's]
impairments had not reached disabling severity prior to her
DLI."  Id.  Here, in contrast, the ALJ did not rely on any such
"contemporaneous evidence [that] was specific and unequivocal"
as to the onset date of Duguay's disability.  See id.; cf. Blea,

466 F.3d at 912-13; Grebenick v. Chater, 121 F.3d 1193, 1201 (8th Cir. 1997) (holding that ALJ did not err where diagnostic and clinical data affirmatively established that progressive disease had not become disabling at later date, thereby leaving no ambiguity over whether it was disabling at earlier date).

The Acting Commissioner's contention that an absence of medical evidence of disability before a specified date can qualify as precise evidence of disability is especially troubling in this case because the record includes evidence explaining why Duguay may not have sought treatment for a disabling medical condition from Dr. Sponseller during this period. The record reveals that Duguay was a poor candidate for additional surgeries, his doctors offered few treatments beyond opiates, Duguay was pursuing self-care strategies recommended by prior doctors, and professional treatment was ineffective and unaffordable without health insurance. Duguay further testified that Dr. Sponseller saw Duguay's complicated abdominal problems as a hospital issue, with the primary care role essentially limited to prescribing painkillers and facilitating hospitalization when necessary. See Tr. at 62, 277-78. Lastly, Duguay's prior hospitalization, in February 2012, was expensive, difficult to endure, and had limited utility. See Blea, 466 F.3d at 912-13 (finding that ALJ erred in inferring that claimant was not disabled based in part on treatment gap and

19

decision to not pursue surgery).  This evidence, which went
largely unexamined by the ALJ, provides an explanation for
Duguay's failure to seek additional treatment from Dr.
Sponseller and prevents the absence of medical evidence from
qualifying as precise evidence that Duguay was not disabled
during this period.

     2.  <u>Dr. Loeser's Opinion</u>

    The Acting Commissioner next argues that precise evidence
of the onset date of Duguay's disability can be derived from the
August 2013 opinion of Dr. Loeser.  This argument fails for
several reasons.  First, Dr. Loeser's opinion was issued months
before the onset date fixed by the ALJ.  Second, Dr. Loeser
never treated Duguay and examined him only once.  Tr. at 303.
Third, the ALJ did not state how much weight he accorded Dr.
Loeser's opinion, which was based on a "physical exam" that
apparently did not involve x-rays or similar diagnostics.  <u>See</u>
Doc. No. 12 at 6; Tr. at 303–05.  Fourth, and most
significantly, Dr. Loeser found "marked wall protrusions with
irregularity."  Tr. at 304.  Based on his physical examination
of Duguay, Dr. Loeser opined that he "would expect [Duguay's]
symptoms to have <u>at least</u> a mild to moderate effect on his
overall functional capacity."  Tr. at 305 (emphasis added).  In
short, Dr. Loeser did not opine on specific residual functional
capacities, and he described a floor for Duguay's limitations,

not a ceiling.  For these reasons, Dr. Loeser's opinion does not
provide precise medical evidence unambiguously establishing that
Duguay was not disabled before December 14, 2013.

  3. <u>Dr. Jaffe's Opinion</u>

  Lastly, the Acting Commissioner argues that Dr. Jaffe's
opinion provides precise medical evidence unambiguously fixing
December 14, 2013 as the onset date for Duguay's disability.
This argument is flawed in several ways.  First, Dr. Jaffe's
opinion was issued months before the onset date fixed by the
ALJ.  Second, Dr. Jaffe neither treated nor examined Duguay, and
his opinion was based only on a medical record review.  Third,
and importantly, the record that Dr. Jaffe reviewed was
incomplete.  Dr. Jaffe's assessment of Duguay's residual
functional capacity, which the ALJ adopted in determining that
Duguay was not disabled before December 2013, was predicated on
a medical record that was missing treatment notes.  Although the
ALJ acknowledged that "[a]dditional treatment notes were
admitted to the record after [Dr. Jaffe] performed his review,"
the ALJ nevertheless gave Dr. Jaffe's opinion "great weight."
Tr. at 26.  The ALJ fails to say what the missing treatment
records are, and this glaring omission invites only speculation.
Instead, he gives only a terse explanation that "these treatment
notes," whatever they are, "do not reflect significant change or
deterioration in the claimant's condition through December 13,

2013." Tr. at 26.  There is no indication that this conclusion
was based on anything other than the ALJ's lay interpretation of
the treatment notes.  See Nguyen, 172 F.3d at 35 (stating that
ALJ's findings are not conclusive if ALJ derived findings by
"judging matters entrusted to experts").

Medical evidence from both before and after a particular
date can be highly relevant in determining whether a claimant's
symptoms were disabling as of that date.  For example, Dr. Jaffe
incorrectly states that there were "[n]o visits/hospitalizations
for [small bowel obstructions]." Tr. at 101.[10]  In reality,
Duguay was hospitalized for an obstruction in February 2012.
Similarly, Dr. Jaffe could not have been aware of Duguay's
subsequent hospitalization for abdominal issues in December
2013.  Cf. Fischer, 831 F.3d at 36 ("[W]here contemporaneous
medical evidence is lacking, post-DLI medical records may
support a finding that the claimant's impairments were severe
prior to her DLI . . . ."). Duguay also observes that "Dr.
Jaffe did not have access to any objective medical imagery . . .

---

[10] Duguay contends, and the Commissioner does not dispute, that
Dr. Jaffe was missing the February 2012 hospitalization records.
That contention is based on 1) Dr. Jaffe's false statement about
the lack of visits or hospitalizations for small bowel
obstruction, 2) the list of evidence that appears in the August
2013 "Disability Determination Explanation" containing Dr.
Jaffe's review, and 3) the chronological numbering of exhibits
submitted to the Social Security Administration.  See Doc. No.
8-1 at 8 & n.2; Doc. No. 14-1 at 7; see also Tr. at 95–96, 101.

such as x-ray, CT, or MRI showing the internal complications of [his] condition." Doc. No. 8-1 at 8.

The medical evidence that Dr. Jaffe was missing could have shed light on Duguay's symptomatology and limitations. Without the 2012 and 2013 hospitalization records bookending the alleged treatment gap, Dr. Jaffe was left to opine on a limited medical record. For these reasons, Dr. Jaffe's opinion does not constitute precise medical evidence that Duguay was not disabled before December 14, 2013.

## IV.   CONCLUSION

In the present case, the ALJ determined the onset date of Duguay's disability without consulting a medical advisor even though the medical evidence that supports his determination was ambiguous. Duguay's testimony as to his condition, the date he stopped working, the opinion of his treating physician, and other medical evidence in the record all support an onset date before Duguay's DLI, yet the ALJ instead based his finding of a later onset date on an improperly-analyzed absence of treatment, the opinion of an examining source who claimed a floor for Duguay's limitations rather than a ceiling, and a non-examining source who based his opinion on incomplete medical records. This evidence, individually and collectively, lacks precision and does not obviate the need for the ALJ to infer an onset date

for Duguay's disability.  Not only is the evidence ambiguous, it does not even qualify as substantial evidence for the ALJ's onset date determination.  Accordingly, the ALJ's decision to determine an onset date for Duguay's disability without the assistance of a medical advisor must be reversed and the case must be remanded for further proceedings consistent with this Memorandum and Order.

Pursuant to sentence four of 42 U.S.C. § 405(g), I grant Duguay's motion to reverse the decision of the Acting Commissioner (Doc. No. 8), and I deny the Acting Commissioner's motion to affirm the decision (Doc. No. 14).  I remand this case to the Acting Commissioner for further administrative proceedings consistent with this Memorandum and Order.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

March 31, 2017

cc:  Laurie Smith Young, Esq.
     Michael T. McCormack, Esq.
     T. David Plourde, Esq.